LaMONTE RYDELL MARTIN,

      Petitioner,

v.

JESSICA SYMMES, Warden,
Oak Park Heights Facility, Minnesota,

      Respondent.

Civil No. 10-4753 (SRN/TNL)

**REPORT AND RECOMMENDATION**

Zachary A. Longsdorf, Esq., 10390 39th Street North, Suite 3, Lake Elmo, Minnesota, 55042, for Petitioner;

Lee W. Barry, Assistant Hennepin County Attorney, C-2000 Government Center, Minneapolis, Minnesota, 55487, for Respondent.

TONY N. LEUNG, United States Magistrate Judge

This matter is before the undersigned Magistrate Judge of the District Court on the petition of LaMonte Rydell Martin ("Petitioner") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a response, and the issues have been fully briefed by the parties. (Docket Nos. 6, 8-10, 12, 26, and 28.) The case has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court will recommend that Petitioner's habeas corpus petition be **DENIED**, and that this action be **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

Petitioner has summarized the underlying facts of this case as follows:

Christopher Lynch was murdered in the back yard of a home located at 626 N. Thomas Avenue, in north Minneapolis on the evening of May 3, 2006. Mr. Lynch was walking with his cousin Jermaine Mack-Lynch toward the home of Mr. Mack-Lynch's brother, Charles Pettis, when, Mr. Mack-Lynch testified[,] a white car drove slowly past. Two assailants exited the white car and chased Mr. Lynch and Mr. Mack-Lynch down an alleyway between N. Thomas Avenue and N. Upton Avenue, which is to the west of N. Thomas Ave. Mr. Mack-Lynch ran the length of the alleyway, turned left and onto N. Thomas Avenue and ran to [the] front door of 701 N. Thomas Avenue where he informed his brother Charles Pettis that he and Mr. Lynch were being chased. By that time Christopher Lynch apparently had travelled from the alleyway between N. Thomas Ave and N. Upton Ave to the alleyway between N. Thomas Ave and N. Sheridan Ave, which is to the east of N. Thomas Ave. As Mr. Lynch reached the backyard of 626 N. Thomas Ave, the two assailants caught up with him and shot him between 11 and 15 times. After the shooting stopped, the white car reappeared and the two shooters got into the car and left the scene. Paramedics arrived at the scene within minutes of the shooting taking place and Mr. Lynch was removed [from] the scene by ambulance. He was pronounced dead upon his arrival at the hospital.

(Petitioner's "Memorandum of Law in Support of Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254" [Docket No. 6], [hereafter "Petitioner's Memorandum"], pp. 1-2.)

A few days after Lynch was murdered, Petitioner was arrested in connection with the crime and, on June 1, 2006, he was indicted for first degree murder. He was seventeen years old at the time.

The State contended that Petitioner and a co-defendant named Cornelius Jackson belonged to a gang identified as the 19 Block Dipset, and Mack-Lynch belonged to a rival gang identified as the Tre Tre Crips. Petitioner and Jackson allegedly were chasing Mack-Lynch as part of an ongoing gang dispute when they shot and killed Lynch. A third man named Jonard McDaniel was accused of being the driver of the white getaway car. Petitioner and Jackson were tried together before a single jury, and McDaniel was prosecuted separately.

Two of the witnesses at Petitioner's trial were Mack-Lynch and Charles Pettis, Mack-Lynch's brother. As related by the Minnesota Supreme Court:

> Mack-Lynch testified that on the day in question, he and Lynch were walking to the home of Mack-Lynch's brother, Charles Pettis. As they were walking, they saw a white Malibu in which Martin [i.e., Petitioner] was the driver and Jackson and McDaniel were passengers. After the car slowed down and the occupants looked at Mack-Lynch and Lynch, the car stopped. Jackson and Martin got out and started chasing them.

> Mack-Lynch and Lynch ran down the alley to the back of Pettis's house, where Lynch stopped because he was short of breath. Mack-Lynch continued running down the alley, thinking that Jackson and Martin would follow him because he was a gang member. Mack-Lynch then doubled back to the front of Pettis's house and told his brother that "One Nines" were chasing him. Subsequently, they heard gunshots and saw Jackson and Martin in a yard across the street firing shots with handguns into the backyard of a nearby house. Mack-Lynch and Pettis ran across the street and found Lynch wounded in the backyard. McDaniel then drove the white car into the alley. Jackson and Martin jumped in the car and the three drove away. According to Mack-Lynch, Jackson was wearing a black hat, and Martin was wearing a red hat.

State v. Martin, 773 N.W.2d 89, 95-96 (Minn. 2009).

> Pettis also testified that he saw Jackson and Martin standing in a yard across the street. Pettis then heard shots fired. He saw Jackson and Martin get into a white car and drive away. Pettis and Mack-Lynch then found Lynch wounded in the backyard. During an interview with the police that same day, Pettis denied knowing the identity of the shooters. But when the investigator left the interview room, Pettis stated in a phone call to a third party: 'I know who did it' but 'like I'd really tell these motherf* * *ers [police] who shot my cousin.' According to Pettis, he lied to the police because he 'wanted to deal with it my way' by 'getting revenge . . . on the street.' Subsequently, Pettis saw physical evidence from the murder scene, changed his mind, and decided to cooperate. On cross-examination, Pettis admitted prior felony convictions for car theft and robbery and that he currently had a pending charge for aggravated robbery. He denied getting a deal from the prosecution in exchange for his testimony.

Id. at 96.

The prosecution also presented testimony from a ten-year-old boy who witnessed the shooting. He said that the shots were fired by two men wearing hats, but he could not see their faces. Other witnesses saw two men who ran from the scene and got into a white car. Id.

Two other prosecution witnesses were Paris Patton, a member of the 19 Block Dipset gang, and Kiron Williams, a member of the Vice Lords gang. Patton and Williams were being held on federal drug charges and agreed to testify in exchange for leniency in their federal criminal cases. As summarized by the Minnesota Supreme Court:

> Both [Patton and Williams] testified that Martin, Jackson, and McDaniel were members of the 19 Block Dipset gang. Patton testified that about three days after Lynch was killed, McDaniel asked him if he had a gun because he had gotten rid of his after using it "on that little boy" who was with Mack-Lynch. About a month after the murder, Patton overheard Jackson say Lynch was on his knees begging for his life when Jackson shot him. Williams testified that McDaniel, Martin, and Jackson all told him they were involved in killing Lynch. According to Williams, Martin bragged to him about chasing Mack-Lynch and then killing the person who was with him. Williams also testified that Jackson told him that he chased Mack-Lynch and Lynch, that Mack-Lynch got away, and then he caught up with Lynch, who pleaded for his life before he was shot.

Id. at 96-97.

At the conclusion of Petitioner's trial, the jury found him guilty of first-degree premeditated murder and committing a crime for the benefit of a gang. The trial court entered judgment on the first-degree murder verdict, and sentenced Petitioner to life in prison without the possibility of parole.

After Petitioner was convicted and sentenced, he filed a direct appeal in the

Minnesota Supreme Court.[1]  Petitioner's appellate counsel filed a brief that raised more than a half dozen claims, and Petitioner himself filed a <u>pro se</u> supplemental brief that presented several additional claims.[2]  All of Petitioner's claims were considered and rejected on the merits, and his conviction and sentence were affirmed.  <u>Martin</u>, <u>supra</u>.

After Petitioner's direct appeal was completed, he filed his present petition for a writ of habeas corpus under 28 U.S.C. § 2254.  This petition lists ten grounds for relief, which are, for the most part, the same claims that were raised in Petitioner's direct appeal.  For the reasons discussed below, the Court finds that Petitioner is not entitled to a writ of habeas corpus on any of the claims raised in his petition.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prescribes the standards that govern this Court's substantive review of Petitioner's habeas corpus claims.  The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court <u>shall not be granted</u> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

---

[1]    Under Minnesota law, appeals in first degree murder cases are taken directly to the State Supreme Court, rather than the Minnesota Court of Appeals.  Minn. Stat. § 632.14.

[2]  Both of these briefs are included in the "Appendix" filed by Respondent.  (Docket No. 10, pp. 1-73.)

presented in the State court proceeding.

(Emphasis added.)  In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme

Court discussed the meaning of this statute and how it should be applied by the federal

district courts.  The Supreme Court recognized that

> a state-court decision can be 'contrary to' this Court's clearly established
> precedent in two ways.  First, a state-court decision is contrary to this Court's
> precedent if the state court arrives at a conclusion opposite to that reached
> by this Court on a question of law.  Second, a state-court decision is also
> contrary to this Court's precedent if the state court confronts facts that are
> materially indistinguishable from a relevant Supreme Court precedent and
> arrives at a result opposite to ours.

<u>Id</u>. at 405.  "Under the 'unreasonable application' clause, a federal habeas court may grant

the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

<u>Id</u>. at 413.

The Court also explained that

> [a] federal habeas court making the 'unreasonable application' inquiry
> should ask whether the state court's application of clearly established federal
> law was <u>objectively unreasonable</u> . . . . [¶] [A] federal habeas court may not
> issue the writ simply because that court concludes in its independent
> judgment that the relevant state-court decision applied clearly established
> federal law erroneously or incorrectly.  Rather, that application must also be
> unreasonable.

<u>Id</u>. at 409, 411 (emphasis added).[3]

A federal district court is not allowed to conduct its own <u>de novo</u> review of a

---

[3]  A writ of habeas corpus can also be granted if the state courts' resolution of a
prisoner's criminal case is "based on an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In other
words, habeas relief can be available if the conviction at issue is based on findings of fact
that could not reasonably be derived from the state court record.  However, Petitioner has
not presented any claims requiring the application of § 2254(d)(2).

prisoner's constitutional claims.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 665 (2004) ("[w]e cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a <u>de novo</u> matter").  "AEDPA . . . imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt' . . . ."  <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1862 (2010) (citations omitted).  Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts.  Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d) as that statute has been interpreted by the Supreme Court in <u>Williams</u>.  The petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 787 (2011).

With these principles in mind, the Court considers whether Petitioner is entitled to a writ of habeas corpus on any of ten claims raised in his current petition.[4]

## III.  DISCUSSION

### A.  Charging Petitioner as an Adult (Ground One)

Petitioner initially claims that his conviction should be vacated because it is unconstitutional to <u>automatically</u> prosecute a minor as an adult in first-degree murder

---

[4]  Petitioner's claims will be discussed in a more or less chronological progression (charging to sentencing), which will not always follow the order in which the claims are listed in the petition.

cases.[5]  In Minnesota, most criminal cases brought against minors (i.e., individuals under the age of eighteen) must be adjudicated in juvenile court,  unless the State seeks to have the minor prosecuted as an adult by means of a certification process.  <u>See</u> Minn.Stat. §§ 260B.101, subd. 1, 260B.125, subd. 1.  A minor normally cannot be removed from juvenile court and prosecuted as an adult in the state district court unless a formal certification hearing is held and the presiding judge finds that certain statutory requirements are satisfied.  But, when a minor over the age of sixteen is accused of first-degree murder, the certification process does not apply, and the minor is <u>automatically</u> prosecuted as an adult. Minn.Stat. § 260B.007, subd. 6(b).  That is what happened to Petitioner here.

Petitioner now claims that he was deprived of his constitutional right to due process because he was automatically prosecuted as an adult, and "subjected to the harsher penalties of adult court," without being granted "any sort [of] hearing where his individual characteristics are taken into account."  (Petitioner's Memorandum, p. 12.)  This claim is

---

[5]  Petitioner did not challenge his prosecution as an adult during the trial court proceedings, so this claim was not automatically reviewable on direct appeal.  Furthermore, the same claim had already been raised and rejected in an earlier case – <u>State v. Behl</u>, 564 N.W.2d 560 (Minn. 1997).  Therefore, the Minnesota Supreme Court refused to consider Petitioner's "automatic certification of juveniles" claim on the merits.  <u>Martin</u>, 773 N.W.2d at 97, n. 2.  This means that the claim has been procedurally defaulted for federal habeas corpus purposes.  <u>See Jones v. Jerrison</u>, 20 F.3d 849, 853 (8th Cir. 1994) ("[f]ederal courts will not review a procedurally defaulted claim because 'a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance'"), quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 732 (1991).  Despite Petitioner's procedural default, the Court finds it suitable to address the claim on the merits because it is so clearly unsustainable.  <u>See Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir.) (<u>en banc</u>) ("[a]lthough the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated"), <u>cert</u>. <u>denied</u>, 528 U.S. 846 (1999).

8

based on the Supreme Court's decision in <u>Kent v. United States</u>, 383 U.S. 541 (1966). <u>Kent</u> holds that <u>when a court must determine</u> whether a minor should be treated as a juvenile or an adult based on certain criteria prescribed by law, the minor must be given a hearing on the application of those criteria. The minor must have an opportunity to show why he should be treated as a juvenile, rather than an adult, under the criteria prescribed by state law. <u>Id</u>. at 553-54.

<u>Kent</u> is not applicable to Petitioner's case because, under Minnesota law, no court was required to decide whether he should be treated as a juvenile or an adult. Once Petitioner was charged with first-degree murder, he was <u>automatically</u> certified for prosecution as an adult without any judicial determination. It would have served no purpose to conduct a hearing because there were no criteria to apply, there was no discretion to exercise, and there was no judicial decision to make. The statute simply required that Petitioner <u>be</u> treated as an adult.

Petitioner recognizes the mandatory nature of Minnesota's automatic certification statute, but he contends that <u>Kent</u> nevertheless requires a hearing before any minor can ever be prosecuted as an adult. (Petitioner's Memorandum, pp. 11-12.) Petitioner, however, has not explained the purpose of such a hearing when automatic certification is mandated by statute. Furthermore, Petitioner has cited no cases in which a due process hearing has been required in an automatic certification scenario. Indeed, Petitioner candidly acknowledged that other courts have not found any rationale for applying <u>Kent</u>'s hearing requirement to automatic certification cases. (<u>Id</u>., p. 11.) <u>See</u> <u>e.g.</u>, <u>United States v. Quinones</u>, 353 F.Supp. 1325, 1328 (D.P.R. 1973) ("[s]ince there is no room for a waiver of any sort in this matter, no hearing is required to satisfy the basic requirements of due

process and fairness").

In <u>Russell v. Parratt</u>, 543 F.2d 1214 (8th Cir. 1976), the Eighth Circuit Court of Appeals concluded that no judicial hearing was required when the apposite state law gave the prosecuting attorney virtually unfettered discretion to charge a minor as an adult. The Court of Appeals reasoned that because the state delegated the charging decision to the executive branch, rather than the judicial branch, there was no judicial determination to be made, so no hearing was required. <u>Id</u>. at 1216-17.

Here, too, the courts had no role to play in determining whether Petitioner should be prosecuted as an adult or a juvenile. That determination was made by the state legislature's enactment of the mandatory certification law. Because there was no decision for the courts to make, no judicial hearing was required. Therefore, Petitioner's due process claim pertaining to his prosecution as an adult must be denied.

### B.  Joint Trial (Ground Three)

Petitioner also claims that he was deprived of his "Due Process rights to a fair trial," because he and his co-defendant, Cornelius Jackson, were tried together in a joint trial. (Petition, p. 8, "Ground Three.") Petitioner contends that his defense was tainted because the jury was exposed to "evidence which pointed to the guilt of Mr. Jackson," but not Petitioner himself. (<u>Id.</u>) This claim is rejected for several reasons.

### 1.  Procedural Default

The Court initially finds that Petitioner's current "joint trial" claim has been procedurally defaulted because it was not fairly presented to the Minnesota Supreme Court and it is now too late to do so. In Petitioner's direct appeal to the Minnesota Supreme Court, he argued that the trial court had misapplied <u>Minnesota's state court procedural rule</u>

10

governing joinder of defendants for trial – Minn. R. Crim. P. 17.03. The state procedural rule identifies certain criteria that must be used when making joinder decisions, including the nature of the offense, the impact on the victim, potential prejudice to defendants, and the "interests of justice." In Petitioner's brief to the Minnesota Supreme Court, he argued that the trial court misapplied the joinder criteria prescribed by state law. (Respondent's Appendix, [Docket No. 10], pp. 36-38.) The state court brief makes no reference to the federal Constitution and it cites no federal cases. Not surprisingly, the Minnesota Supreme Court's discussion of Petitioner's joint trial claim also includes no reference to the Constitution or any federal law. The Minnesota Supreme Court did not address the constitutionality of the joint trial, but instead addressed the only issue that was raised by Petitioner – i.e., whether the trial court had properly applied the Minnesota state procedural rule governing joint trials. Martin, 773 N.W.2d at 99-100.

It is well settled that state prisoners must fairly present all of their federal constitutional claims to the state courts before seeking habeas corpus review of such claims in federal court. Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam). "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." Id. In other words, if a state prisoner claims "that his incarceration violates federal law, 'he must say so, not only in federal court, but in state court.'" Wyldes v. Hundley, 69 F.3d 247, 251 (8th Cir. 1995) (quoting Duncan, supra), cert. denied, 517 U.S. 1172 (1996); see also Picard v. Connor, 404 U.S. 270, 276 (1971) ("we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts"). "Even if state law 'bears some relation to' federal constitutional

requirements, 'habeas petitioners must have explicitly cited to the United States Constitution or federal case law in their direct [state court] appeal to preserve federal review.'" Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996) (emphasis added) (quoting Luton v. Grandison, 44 F.3d 626, 628 (8th Cir. 1994), cert. denied, 513 U.S. 1195 (1995)).

In this case, Petitioner has raised his federal constitutional challenge to his joint trial for the first time in his current habeas corpus petition. He did not challenge his joint trial on constitutional grounds in the Minnesota Supreme Court. Because Petitioner did not "fairly present" his current constitutional claim to the State Court, that claim cannot be entertained here. See McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) ("before we may reach the merits of a habeas petition, we must first determine whether the petitioner has fairly presented his federal constitutional claims to the state court"); Hall v. Delo, 41 F.3d 1248, 1249 (8th Cir. 1994) (same).

Furthermore, it is now too late for Petitioner to raise his new constitutional joint trial claim in the state courts. Minnesota law provides that once a prisoner has completed his direct appeal, he is precluded from litigating any new claims that could have been raised on appeal. McCall, 114 F.3d at 757 (citing State v. Knaffla, 243 N.W.2d 737, 741 (Minn. 1976); Roby v. State, 531 N.W.2d 482, 484 (Minn. 1995)). Petitioner's constitutional challenge to his joint trial could have been raised on direct appeal, but that constitutional claim was not fairly presented to the Minnesota Supreme Court. Therefore, Petitioner's constitutional joint trial claim has been procedurally defaulted for federal habeas purposes. McCall, 114 F.3d at 757-58.[6]

_____

[6] Although a petitioner's procedural default can be overcome by showing cause and prejudice or actual innocence, Coleman v. Thompson, 501 U.S. 722, 750 (1991), Petitioner

## 2. Application of Supreme Court Precedents

Even if Petitioner's constitutional challenge to his joint trial were not procedurally defaulted, he still could not be granted a writ of habeas corpus on that claim, because he has not shown that the state courts misapplied any controlling decisions by the United States Supreme Court. Petitioner's current joint trial claim relies primarily on Zafiro v. United States, 506 U.S. 534 (1993). However, Zafiro was a federal criminal case that involved the interpretation and application of federal procedural rules – namely, Fed. R. Crim. P. 8 and 14. Zafiro is not a federal constitutional case and it does not establish any federal constitutional principles that are binding on Minnesota's state courts. As explained by the Sixth Circuit Court of Appeals:

> Zafiro involved the interpretation of Federal Rules of Criminal Procedure 8, 14, and 18, not the United States Constitution. Zafiro thus has no precedential weight in reviewing state court proceedings on due process grounds.

Phillips v. Million, 374 F.3d 395, 398 (6th Cir. 2004). See also Hardy v. Commissioner, Alabama Dept. of Corrections, 684 F.3d 1066, 1078 (11th Cir. 2012) ("Zafiro is a Federal Rule of Criminal Procedure case, not a case announcing a principle of constitutional law"); Collins v. Runnels, 603 F.3d 1127, 1132 (9th Cir.) ("Zafiro only applies to federal and not state court trials"), cert. denied, 131 S.Ct. 243 (2010).

Petitioner has not cited any case in which the United States Supreme Court has discussed the constitutional limitations on joint trials. He certainly has not shown that the Minnesota state courts' adjudication of his joint trial claim involved an objectively

_____

has made no effort to satisfy either of those standards and the Court finds no reason to believe that he could do so.

unreasonable application of any specific U.S. Supreme Court precedent dealing with the constitutionality of joint trials. Indeed, Petitioner has not cited a single case of any kind in which a joint trial was held to be <u>unconstitutional</u>.[7]

### 3. Fundamental Unfairness

Even if the Court were to overlook Petitioner's procedural default and conduct a <u>de novo</u> review of his new constitutional challenge to his joint trial claim, his claim would still fail. In a case decided without applying the AEDPA standard of review, the Eighth Circuit Court of Appeals held that "[a] habeas petitioner is not entitled to relief on the grounds that he was entitled to a severance unless he can show that a joint trial was fundamentally unfair." <u>Hood v. Helling</u>, 141 F.3d 892, 896 (8th Cir. 1998) (citing <u>Jenner v. Class</u>, 79 F.3d 736, 741 (8th Cir. 1996), <u>cert</u>. <u>denied</u>, 519 U.S. 874 (1996)), <u>cert</u>. <u>denied</u>, 525 U.S. 1004 (1998).[8] Petitioner contends that in his case a joint trial was "fundamentally unfair" because the prosecution was able to introduce incriminating evidence against his co-defendant,

---

[7] The Court has not overlooked Petitioner's references to <u>Bruton v. United States</u>, 391 U.S. 123 (1968). Although that case did involve a joint trial, the Supreme Court was required to decide a very narrow and specific issue pertaining to the admissibility of a particular piece of evidence – namely, a co-defendant's confession. The Supreme Court ruled that the confession was not admissible because the co-defendant who gave the confession was not subject to cross-examination (because he exercised his Fifth Amendment right to not testify against himself). In this case, it appears that Petitioner's co-defendant, Jackson, did not give a confession <u>per se</u>, but at most made some incriminating statements to other parties. In any event, Jackson testified at trial, so he was available for cross-examination. Therefore, the narrow Sixth Amendment evidentiary ruling in <u>Bruton</u> does not support Petitioner's broad due process challenge to his joint trial.

[8] In <u>Hood</u>, the parties disagreed about whether AEDPA was applicable because the habeas petition was filed before AEDPA was enacted, but it was decided after AEDPA had gone into effect. The Eighth Circuit did not squarely address the issue in ruling that the outcome of the petitioner's joint trial claim would be the same regardless of which standard of review the Court applied. <u>Hood</u>, 141 F.3d at 894, n. 1.

which also tended to incriminate Petitioner himself.  The jury allegedly would not have received that incriminating evidence had Petitioner been tried alone.

A similar argument was raised and rejected in <u>Hood</u>.  There, the petitioner contended that "the joint trial led to the admission of evidence that could not have been used against him had he been tried alone, and that this denied him the specific due process right to be tried only on evidence admissible against him."  <u>Hood</u>, 141 F.3d at 897.  The Court rejected this argument, pointing out that "the admission of evidence by one party that is harmful to the other do[es] not necessarily make a trial fundamentally unfair."  <u>Id</u>.

Petitioner's co-defendant, Jackson, apparently presented an alibi defense and took the witness stand himself in order to promote that defense.  By doing so, Petitioner contends, Jackson allowed the prosecution to introduce self-incriminating statements (by Jackson), which also tended to incriminate Petitioner.  (Petitioner's Memorandum, pp. 16-17.)  Petitioner, however, has not specifically identified any such incriminating statements, and he has made no effort to show that any such statements (whatever they might have been) were so incriminating that they caused the trial to be "fundamentally unfair."

In <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), the Supreme Court rejected the notion that co-defendants should be tried separately "whenever an incriminating statement of one of them is sought to be used."  <u>Id</u>. at 209.  The Court pointed out that conducting separate trials is "not as facile or as just a remedy as might seem," explaining that

> [j]oint trials play a vital role in the criminal justice system, accounting for almost one-third of federal criminal trials in the past five years . . . . Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit.  Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Id. at 209-10.

> In fact, the [Supreme] Court has said that when a single crime is committed against a single victim in a single series of events by several defendants, a joint trial is not only acceptable but is desirable to promote greater reliability and consistency in the verdicts. <u>Buchanan v. Kentucky</u>, 483 U.S. 402 . . . (1987). A misjoinder of defendants rises to the level of a <u>federal constitutional violation</u> only if it results in <u>substantial</u> prejudice to a defendant. <u>United States v. Lane</u>, 474 U.S. 438 . . . (1986).

<u>Johnson v. Bett</u>, 349 F.3d 1030, 1037 (7th Cir. 2003). Needless to say, "'[i]n challenging the trial court's failure to sever his trial from that of his codefendant, [a habeas petitioner] bears a heavy burden.'" <u>Jenner</u>, 79 F.3d at 741 (quoting <u>Hollins v. Dep't of Corrections</u>, 969 F.2d 606, 608 (8th Cir. 1992)).

Here, the Court finds that Petitioner simply has not satisfied the "heavy burden" of showing "substantial prejudice" resulting from his joint trial. He has not clearly identified any <u>specific</u> evidence that was used to convict him, which would not have been presented to the jury if he had been tried alone. Moreover, he has not shown there is a reasonable likelihood that any such evidence affected the outcome of his trial. As a result, Petitioner has not adequately demonstrated that the joint trial truly denied his constitutional right to a fair trial. For the reasons above stated, Petitioner cannot be granted a writ of habeas corpus on his joint trial claim.

### C. Batson Claim (Ground Four)

In Ground Four, Petitioner asserts that "he is entitled to a new trial because the State improperly exercised a p[er]emptory challenge to strike an African American juror because of his race in violation of the 14th Amendment to the United States Constitution and <u>Batson v. Kentucky</u>," 476 U.S. 79 (1986). (Petition, p. 10, "Ground Four.") The peremptory challenge at issue was used against a venireperson referred to as "Juror 43,"

who was the first African American to be interviewed during voir dire.

Juror 43, like the other prospective jurors, completed a questionnaire that provided certain information about himself. In response to one of the questions, Juror 43 expressed some concern about whether African Americans are treated the same as other citizens in court proceedings. As explained by the Minnesota Supreme Court:

> Initially, the district court asked [Juror 43] questions regarding his answer to a juror questionnaire about his opinions of the criminal justice system, where he wrote, 'Do African American/minorities receive the same treatment as nonminorities?' He explained that he questioned whether people of color are 'being treated equally when there is a hearing and when punishment or time to be served is fair.' He believed that people of color received harsher punishments and may not receive fairness and equal treatment. He further stated, however, that his concerns would not affect his ability to be a fair and impartial juror. He admitted that he had a cousin who may have been wrongfully convicted of a crime. He also acknowledged that his coworker was the uncle of [the victim].

Martin, 773 N.W.2d at 101-02.

When the prosecutor attempted to exercise a peremptory challenge against Juror 43, Petitioner objected, contending that the challenge was racially motivated. The trial court initially upheld that objection and the prosecutor then asked Juror 43 some additional questions. During that later segment of the voir dire, Juror 43 reiterated that he thought his cousin might have been wrongly convicted of a crime, and he had heard other people say minorities receive harsher sentences than non-minorities. Id. at 102. The prosecutor then renewed his peremptory challenge to Juror 43 and the trial court allowed Juror 43 to be stricken. Id.

In Petitioner's direct appeal, he argued that the peremptory strike against Juror 43 was racially motivated and thus forbidden by Batson. The Minnesota Supreme Court denied the claim because the trial court had properly applied Batson's three-step process

for resolving such claims.

At step one of the <u>Batson</u> process, a criminal defendant must make a prima facie showing that the prospective juror is a member of an identifiable racial group and that there is some particular reason to suspect that he or she may have been stricken because of his or her race. If the defendant makes the requisite prima facie showing, then, at step two, the prosecutor must offer some racially neutral reason for striking the potential juror in question. At step three, the court must determine whether the reason offered by the prosecution is genuine or merely pretextual. <u>Batson</u>, 476 U.S. at 96-98; <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995) (<u>per</u> <u>curiam</u>).

The Minnesota Supreme Court recognized that a trial court's ruling on a <u>Batson</u> claim must be given "great deference" and will not be reversed "unless it is clearly erroneous." <u>Martin</u>, 773 N.W.2d at 101. The reasons for such deference were explained by the United States Supreme Court in <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477-78 (2008):

> The trial court has a pivotal role in evaluating <u>Batson</u> claims. Step three of the <u>Batson</u> inquiry involves an evaluation of the prosecutor's credibility, . . . [citing <u>Batson</u>, 476 U.S. at 98, n. 21], and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,' . . . [citing <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991) (plurality opinion)]. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "peculiarly within a trial judge's province,' ' <u>ibid</u>. (quoting <u>Wainwright v. Witt</u>, 469 U.S. 412, 428 . . . (1985)), and we have stated that 'in the absence of exceptional circumstances, we would defer to [the trial court].' [<u>Hernandez</u>,] 500 U.S. at 366.

The trial court has a unique opportunity to evaluate facial expressions, tone of voice, body

language, and other qualities that do not appear in a court reporter's transcript. Those non-verbal factors can play a critical role in evaluating the mindset of a prosecutor or a prospective juror. Therefore, when a trial court properly applies the prescribed formula for resolving a <u>Batson</u> challenge, state appellate courts – and federal habeas courts – must be wary of second-guessing the trial court's ruling.

Here, Petitioner acknowledges that the state courts used the correct three-step formula to resolve his <u>Batson</u> challenge, but he contends that the formula was not reasonably applied to the facts of his case. (Petitioner's Memorandum, p. 6.) He specifically argues that the state courts wrongly examined the peremptory strike against Juror 43 in isolation and not within the context of the entire jury selection process. (<u>See</u> Petitioner's Reply, p. 5 ("the United States Supreme Court has warned that analysis does not end with simply looking at the single juror at issue, but that a larger review is necessary in which an analysis is made to see if the reasons for striking the minor[ity] juror would apply to non-minority jurors who were permitted to serve" (citing <u>Miller-El v. Dretke</u>, 545 U.S. 231, 241 (2005)).)

Petitioner claims that six other prospective jurors could have been stricken for the same reason that the prosecutor offered in support of his peremptory strike against Juror 43 – namely, some past involvement in court proceedings, either personally or through a relative. One of the reasons that Juror 43 was stricken was because he had a cousin who had been convicted of causing injuries to a child. Juror 43, however, allegedly was not the only prospective juror with some direct or indirect experience with the court system. According to Petitioner, prospective Jurors 13, 19, 30, 47, 52, and 64 had some experience that was similar to that of Juror 43, but the prosecutor did not exercise a peremptory strike

against any of them.  (Petitioner's Reply, pp. 3-6.)  Furthermore, five of those six other prospective jurors allegedly were not minorities.  (Id.)  Petitioner therefore believes that Juror 43 must have been stricken because of his race and not because of his past indirect experience with the court system.

Based on Petitioner's own descriptions of those other six prospective jurors, however, the Court finds that all of them are readily distinguishable from Juror 43.  While Juror 43 believed that his cousin "may have been wrongfully convicted" in a Minnesota state court proceeding, Martin, 773 N.W.2d at 102, Petitioner has offered no reason to believe that any of the other six prospective jurors harbored similar doubts about the competency and integrity of the state court system.[9]  (See Petitioner's Reply, pp. 4-5.) Juror 43 also acknowledged that his coworker was the uncle of the victim.  While one might speculate generically that this might be favorable to the prosecution, the opposite might also be true.  It would be a race-neutral reason and not pretext to strike a potential juror in order to avoid introducing this element into an already challenging and presumably emotional trial.

_____

[9]  One of the six prospective jurors cited by Petitioner, "Juror 47," was an African American woman who was not rejected by the prosecutor, even though she had a cousin who was convicted in a Minnesota court.  Petitioner suggests that Juror 47 was not stricken because she was the next African American to be voir dired after Juror 43 and it would have looked bad if the prosecutor had attempted to strike her too.  (Petitioner's Reply, p. 7 ("there was little chance the state would attempt to strike her as she was only the second African-American juror to be questioned, with Juror 43 being the first").)  It appears just as likely, however, that the prosecutor did not attempt to strike Juror 47 because she, unlike Juror 43, had a favorable opinion about the state criminal justice system.  (See Petitioner's Reply, pp. 4-5, (noting that Juror 47 wanted to get rid of gangs, she aspired to be a prison guard, and she was satisfied with the manner in which the Hennepin County Attorney prosecuted someone who murdered her cousin).)  Comparing Juror 43 and Juror 47 supports the trial court's determination that Juror 43 was stricken not because of his race, but because of his skepticism about the fairness of the court system.

The trial court found that Juror 43 was not "forthcoming" about his reasons for believing that his cousin might have been wrongly convicted and the state court system might treat minorities unfairly.  Martin, 773 N.W.2d at 103.  The Minnesota Supreme Court had to give due deference to the trial court's assessment of Juror 43's candor and demeanor, and this Court must do so as well.  Indeed, the deference required from this Court is "double-layered."  Caldwell v. Maloney, 159 F.3d 639, 649 (1st Cir. 1998), cert. denied, 526 U.S. 1009 (1999).  First, as the Supreme Court stated in Snyder supra, "a trial judge's Batson findings are given substantial weight because the trial judge is in the best position to evaluate context, nuance, and the demeanor of the prospective jurors and the attorneys."  Id.  Second, "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 131 S.Ct. 1305, 1307 (2011) (quoting Renico, 130 S. Ct. at 1862).

The Supreme Court's decision in Felkner reiterates that federal habeas review of a Batson claim must be extremely deferential.  With that admonition in mind, the Court finds that Petitioner's current Batson claim is not sustainable.  The trial court applied the correct procedure for resolving Petitioner's Batson challenge.  The prosecutor offered a race neutral rationale for exercising a peremptory strike against Juror 43.  Based on a first-hand assessment of the prosecutor's demeanor and Juror 43's demeanor, the trial court accepted the prosecutor's explanation and determined that Petitioner had failed to show that the prosecutor's strike was racially motivated or pretextual.  The Minnesota Supreme Court upheld the trial court's decision, and gave a suitable explanation for doing so.  Applying the AEDPA standard of review, this Court cannot find sufficient justification to

overturn the Minnesota Supreme Court's adjudication of Petitioner's <u>Batson</u> claim.

### D.  Admission of Undisclosed Evidence (Ground Seven)

During the course of Petitioner's trial, a prosecution witness identified as Sergeant Dunlap was allowed to review some notes she had made, which were not included in her official police report.  Petitioner's attorneys objected, arguing that Dunlap's notes and her testimony based on those notes, should be stricken as inadmissible evidence because the prosecution had not disclosed the notes to the defense during the pre-trial discovery process.  The notes and testimony at issue apparently pertained to another prosecution witness, Paris Patton, one of the "jailhouse informants" who testified at Petitioner's trial. Petitioner's attorneys were allowed to review the Dunlap notes, but the trial court overruled Petitioner's objection to the admissibility of the notes and Dunlap's related testimony.

On Petitioner's direct appeal, he challenged the trial court's ruling on the admissibility of Dunlap's notes and related testimony.  Petitioner cited his constitutional right to discover exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), his constitutional right to be informed of the charges against him, and his constitutional right to confront and cross-examine adverse witnesses.[10]

The Minnesota Supreme Court rejected Petitioner's claim regarding the admission of Dunlap's notes and related testimony because (1) defense counsel was afforded an opportunity to review the disputed evidence, i.e., Dunlap's notes; (2) Petitioner was allowed to confront and cross-examine both Dunlap and Paris Patton; and (3) "any discovery

---

[10]    These arguments were raised in Petitioner's <u>pro</u> <u>se</u> supplemental brief. (Respondent's Appendix, p. 70.)

22

violations . . . were harmless."  Martin, 773 N.W.2d at 109.

Petitioner now renews his challenge to the admissibility of Dunlap's notes and testimony, claiming that he was deprived of his constitutional right to discovery under Brady and his constitutional right to cross-examine witnesses.  These claims are baseless.

In Strickler v. Greene, 527 U.S. 263, 281-82 (1999), the Supreme Court summarized the requirements for a Brady claim as follows: "There are three components of a true Brady violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

In this case, the Minnesota Supreme Court found that Petitioner failed to satisfy two of the required elements of a Brady claim.[11]  First, Petitioner failed to demonstrate that the evidence at issue supported his defense.  Martin, 773 N.W.2d at 109 ("[t]he notes only corrected a mistake in Dunlap's formal report").  Second, Petitioner failed to demonstrate any meaningful prejudice resulting from the undisclosed evidence.  Id. ("if there were any discovery violations here, they were harmless").  The Minnesota Supreme Court also rejected Petitioner's Sixth Amendment claim tied to the undisclosed evidence, because he was allowed to cross-examine both the author of the undisclosed notes (Dunlap) and the subject of those notes (Paris Patton).  Id.

Petitioner has not shown that the Minnesota Supreme Court committed any error in

---

[11]  It appears that one of the three elements was satisfied, because the prosecutor did fail to produce Dunlap's notes during pretrial discovery, apparently because the prosecutor was unaware of the notes.  As previously mentioned, however, the prosecutor agreed to produce the notes to Petitioner's counsel "once he received them from Dunlap." Martin, 773 N.W.2d at 109.

its analysis of his <u>Brady</u> and Sixth Amendment claims pertaining to Dunlap's undisclosed notes. Petitioner has not established that the evidence at issue was exculpatory, useable for impeachment, or otherwise supporting of his defense. He also has not shown that he was prejudiced in any manner by reason of the prosecutor's failure to disclose the evidence before trial. And, he has not shown that his ability to cross-examine any witness was impaired because of the late disclosure of the evidence at issue. Therefore, Petitioner has failed to show that the Minnesota Supreme Court committed any error that is cognizable under 28 U.S.C. § 2254(d).

### E. Breach of Sequestration Order/Wrongful Admission of Testimony (Ground Eight)

One of the witnesses at Petitioner's trial, Charles Pettis, violated a sequestration order by entering the courtroom while another witness, Jermaine Mack-Lynch, was testifying. Pettis acknowledged that he had heard at least some of Mack-Lynch's testimony. Petitioner contends that because Pettis violated the sequestration order, he "was present when Mr. Mack-Lynch explained where he had seen the alleged shooters, and was able to testify in a manner consistent with Mr. Mack-Lynch about perhaps the most important aspect of the State's case, the alleged location of Petitioner immediately prior to the shooting of Christopher Lynch." (Petitioner's Memorandum, p. 22.)

Petitioner sought to bar Pettis from testifying because he had violated the sequestration order. The trial court rejected that argument and allowed Pettis to testify. Petitioner, however, was allowed to impeach Pettis by asking him questions about his presence in the courtroom during Mack-Lynch's testimony.

On Petitioner's direct appeal, he claimed that he had been denied a fair trial because

Pettis had been allowed to testify after violating the sequestration order. The Minnesota Supreme Court rejected that claim because Petitioner had not "demonstrated any prejudice." Martin, 773 N.W.2d at 110.

Petitioner now claims that he is entitled to a writ of habeas corpus that would vacate his conviction because he was denied due process by the admission of Pettis's testimony. But, "rulings on the admission or exclusion of evidence in state trials rarely rise to the level of a federal constitutional violation." Nebinger v. Ault, 208 F.3d 695, 697 (8th Cir. 2000). Normally, "[a] state court's evidentiary ruling is a matter of state law," and federal courts "may examine the ruling in a habeas proceeding only to determine whether the asserted error denied due process." Bailey v. Lockhart, 46 F.3d 49, 50 (8th Cir. 1995). "To establish a due process violation warranting federal habeas relief, [a habeas petitioner] must prove that the [evidentiary] error was 'so gross' . . . 'conspicuously prejudicial' . . . or otherwise of such magnitude that it fatally infected the trial and failed to afford [the petitioner] the fundamental fairness which is the essence of due process." Kerr v. Caspari, 956 F.2d 788, 790 (8th Cir. 1992) (quoting Rainer v. Dep't of Corrections, 914 F.2d 1067, 1072 (8th Cir. 1990), cert. denied, 498 U.S. 1099 (1991)); see also Bounds v. Delo, 151 F.3d 1116, 1119 (8th Cir. 1998) (same).

Needless to say, a habeas petitioner who claims that a state court evidentiary ruling violated his federal constitutional rights faces a heavy burden of persuasion. "'To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial, i.e., absent the alleged impropriety the verdict probably would have been different.'" Gee v. Groose, 110 F.3d 1346, 1350 (8th Cir. 1997) (emphasis added) (quoting Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995));

see also Harris v. Bowersox, 184 F.3d 744, 752 (8th Cir. 1999), cert. denied, 528 U.S. 1097 (2000).

In this case, the Minnesota Supreme Court concluded that Petitioner had not been prejudiced by the admission of Pettis's testimony. Petitioner obviously disagrees with that determination, but he has not shown that the State Court's ruling was contrary to, or involved an unreasonable application of, any decision of the United States Supreme Court. Nor has Petitioner shown that the State Court's ruling was based on any unreasonable determination of the facts. Petitioner simply wants the federal court to second-guess the State Court's lack-of-prejudice determination. But, "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico, 130 S. Ct. at 1855. Petitioner cannot be granted a writ of habeas corpus based on the allegedly wrongful admission of Pettis's testimony.

### F. Exclusion of Videotape Evidence (Ground Nine)

The next claim to be considered is another admission-of-evidence claim. Petitioner contends that the trial court wrongly excluded certain videotape evidence which purportedly would have given the jury another perspective of the crime scene. Petitioner claims that he "was denied Due Process and his right to present a full defense when the district court refused to allow him to present [the videotape] to the jury." (Petition, p. 18, "Ground Nine.")

The trial court refused to let Petitioner introduce the videotape because the police officer who recorded it was not available to testify. Petitioner requested that the videotape be presented by another police officer, who purportedly could have verified its authenticity. He also requested that the videotape be presented to the jury without the accompanying

audio recording, but the trial court still refused to let Petitioner introduce it.

The Minnesota Supreme Court acknowledged that the trial court's reasons for barring the videotape were "not entirely clear." Martin, 773 N.W.2d at 109. The court ultimately concluded, however, that

> the videotape was largely redundant because photographs already admitted showed the same scenes the video would have shown. In fact, Martin was still able to argue that the eyewitnesses could not have seen what they claimed to see based on the photographs. Thus, on the record before us, we conclude that the failure to admit the video evidence was harmless.

Id.

As discussed above, state court rulings on evidentiary matters are generally governed by the state rules of evidence, not the federal Constitution. Wood v. Lockhart, 809 F.2d 457, 459 (8th Cir. 1987). Such evidentiary rulings are reviewable in federal habeas cases only if the ruling at issue effectively deprived the petitioner of his due process right to a fair trial. Bailey v. Lockhart, supra. A habeas petitioner who claims that a state court evidentiary ruling violated his federal constitutional right to due process faces a heavy burden of persuasion. As discussed above, "the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial – i.e., that absent the alleged impropriety the verdict probably would have been different.'" Gee, supra.

In this case, the Minnesota Supreme Court found that the crime scene was adequately depicted by photographs admitted into evidence and that Petitioner was able to use those photographs to cast doubt on the testimony of prosecution witnesses. Martin, 773 N.W.2d at 109. The State Court concluded that the videotape at issue was "largely redundant" and "the failure to admit the video evidence was harmless." Id. In other words,

the State Court found that the jury's verdict probably would not have been different if Petitioner had been allowed to introduce the videotape evidence cited in his habeas corpus petition. Petitioner has not shown that this ruling is contrary to, or an unreasonable application of, any United States Supreme Court decision. Therefore, this Court finds that Petitioner cannot be granted a writ of habeas corpus on his videotape evidence claim.

### G. Prosecutorial Misconduct (Ground Six)

Ground Six of the petition presents multiple claims of prosecutorial misconduct. Petitioner contends that the prosecutor violated his right to due process by asking improper questions of witnesses and making improper remarks during closing arguments. He specifically contends that the prosecutor:

(1) improperly asked a witness a question that referred to "gangsters;"

(2) improperly implied that a witness might have felt endangered or intimidated by Petitioner or his associates;

(3) improperly asserted that Petitioner's co-defendant had lied to the jury;

(4) improperly called attention to Petitioner's failure to testify by asserting that his co-defendant's alleged lies would not have come to light if he (the co-defendant) had not voluntarily testified;

(5) improperly tried to nullify Petitioner's presumption of innocence by telling the jury that criminal defendants are frequently found guilty;

(6) improperly argued that failing to convict Petitioner would be a mistake;

(7) improperly cast aspersions on the neighborhood where the murder occurred;

(8) improperly criticized the defense for trying to discredit the State's witnesses;

(9) improperly interjected personal opinions about Petitioner's defense;

(10) improperly suggested that prosecution witnesses facing federal criminal charges were highly motivated to be truthful because, if they failed to do so, they would be "screwed, lewd and tattooed;" and

(11) improperly argued that Petitioner and his co-defendant must have killed the victim because there was no evidence pointing to other suspects.

(Petition, pp. 13-14; Petitioner's Memorandum, pp. 19-20; Petitioner's Reply, pp. 17-19.)

The Minnesota Supreme Court discussed each aspect of Petitioner's prosecutorial misconduct claim very extensively.[12] Most of the incidents cited by Petitioner were found to be acceptable prosecutorial practices. The incidents that were regarded as questionable were found to be harmless error.[13] The Minnesota Supreme Court repeatedly pointed out that the prosecutor's remarks were not particularly egregious, the trial court judge took proper steps to cure or ameliorate effectively any questionable practices, and the overall evidence of Petitioner's guilt was very compelling.[14]

---

[12] The majority opinion in Martin covers approximately fifteen pages in the Northwestern Reporter, and four of those pages – more than 25% of the entire opinion – is devoted to the various aspects of Petitioner's prosecutorial misconduct claim.

[13] The only incidents that the Minnesota Supreme Court found to be possibly improper were (1) the reference to "gangsters," (see Martin, 773 N.W.2d at 105), and (2) a suggestion that Petitioner's co-defendant could have testified before the grand jury, (id. at 105-06).

[14] See e.g., Martin, 773 N.W.2d at 105 ("These were brief questions in a seven-day trial, curative instructions were given, and there was overwhelming evidence in support of Martin's guilt."); id. at 106 ("This was a brief comment by the prosecutor directed at Martin's codefendant in a 75–page closing argument. Any potential misconduct was mitigated by the bench conference and the subsequent correction made by the prosecutor. Further, the evidence of Martin's guilt was strong."); id. at 107 ("[T]he [prosecutor's] statements were inartful attempts to argue that witnesses were credible. Moreover, the jury was instructed to disregard the statements. Thus, any possible misconduct by the prosecutor was harmless.")

The Eighth Circuit Court of Appeals has explained:

> As a general rule, 'prosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the trial with enough unfairness to render [a] petitioner's conviction a denial of due process.' Louisell v. Dir. of Iowa Dept. of Corr., 178 F.3d 1019, 1023 (8th Cir.1999) (citations omitted). To amount to a due process violation, improper remarks by a prosecutor must be 'so egregious that they fatally infect [] the proceedings and render[] [a defendant's] entire trial fundamentally unfair.' Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir.1985). A petitioner 'must show that there is a reasonable probability that the error complained of affected the outcome of the trial – i.e., that absent the alleged impropriety the verdict probably would have been different.' Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir.1995) (citations omitted)."

Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002), cert. denied, 537 U.S. 909 (2002).

"'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned . . . . Rather, the 'relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)), cert. denied, 520 U.S. 1109 (1997). "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety, the verdict probably would have been different.'" Id. (quoting Jones v. Jones, 938 F.2d 838, 844-45 (8th Cir. 1991)).

The standard of review for a prosecutor's closing arguments has been summarized as follows: "Federal habeas relief should only be granted if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would

have sua sponte declared a mistrial."  James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999), cert. denied, 528 U.S. 1143 (2000).

In cases involving comments far more egregious than those at issue here, the Court of Appeals has found that habeas petitioners were not denied due process.  The case of Kellogg v. Skon, 176 F.3d 447 (8th Cir. 1999), is particularly informative.  There, the Court analyzed a habeas petitioner's prosecutorial misconduct claim as follows:

> [T]he prosecutor also referred to [the petitioner] as a 'monster, a 'sexual deviant,' and a 'liar.' . . . [Footnote omitted.]  Not only are these comments an improper 'personal expression of [the] defendant's culpability, . . . ' [citation omitted] but the 'monster' and 'sexual deviant' comments also create inflammatory prejudice.  They compel the jury to focus on the grossness of the alleged conduct, rather than whether the defendant engaged in the conduct.  They have no place in a courtroom.  However, the question is not whether the prosecutor's remarks are 'undesirable or even universally condemned.' . . . The remarks must make the entire trial fundamentally unfair . . . .  The court instructed the jury that they were to make their decisions based on the evidence and that counsel's arguments were not evidence.  These comments did not 'manipulate or misstate the evidence,' nor did they 'implicate other specific rights of the accused.' . . . The weight of the evidence was heavy, and there is no reasonable probability that the verdict would have changed absent the comments, even considering the cumulative effect of the prosecutor's remarks.

Id. at 451-52 (citations to Darden, supra, omitted).

Using the guidance provided by the Court of Appeals, the Court has reviewed the various instances of prosecutorial misconduct cited by Petitioner here.  The Court of Appeals has made it abundantly clear that prosecutorial misconduct warrants federal habeas corpus relief only under the most egregious circumstances.  Petitioner has not adequately demonstrated that any such circumstances occurred during his trial.

As noted above, the Minnesota Supreme Court found that most of the alleged incidents of prosecutorial misconduct cited by Petitioner did not constitute misconduct at

all. The few instances when the prosecutor arguably did "cross the line" were not significant when viewed against the backdrop of the entire trial. (See fn. 14 and fn. 15, supra.) The Minnesota Supreme Court concluded that the prosecutor did not say anything so improper that it effectively deprived Petitioner of a fair trial.

Bearing in mind the deferential standard of review that applies in federal habeas corpus cases, this Court cannot conclude that the Minnesota Supreme Court's resolution of Petitioner's prosecutorial claims was objectively unreasonable. This Court finds no reason to disagree with the State Court's adjudication of those claims. Therefore, the claims presented in Ground Six of the current petition must be denied.

## H. Insufficiency of the Evidence Claim (Ground Five)

Ground Five of the current petition presents an "insufficiency of the evidence" claim. Petitioner contends that "his Due Process rights under the United States Constitution were violated when he was convicted of committing a crime for the benefit of a gang despite insufficient evidence to satisfy all the elements of that crime." (Petition, p. 11, "Ground Five.") This claim was previously raised in Petitioner's direct appeal. The Minnesota Supreme Court summarily rejected the claim as moot because Petitioner was convicted and sentenced for first degree murder, and he was not convicted or sentenced on the separate charge of a crime committed for the benefit of a gang. Martin, 773 N.W.2d at 108-09.

Petitioner's habeas corpus petition simply repeats the same insufficiency-of-the-evidence claim that was held to be moot on direct appeal. He has made no effort to show that the Minnesota Supreme Court's mootness determination was contrary to, or involved an unreasonable application of, any decision by the United States Supreme Court. In fact,

Petitioner has not cited any error in the Minnesota Supreme Court's adjudication of his insufficiency of the evidence claim. Therefore, Petitioner's current presentation of his insufficiency of the claim must be summarily denied.

Petitioner's insufficiency of the evidence claim is accompanied by a paragraph identified as "supporting facts." In the final sentence of that paragraph, Petitioner asserts that "the shear [sic] amount of testimony related to gangs surely had a strong prejudicial impact on Petitioner's right to a fair trial when much of the gang evidence did not even directly relate to Petitioner." (Petition, p. 12, "Ground Five," subsection (a).) It is unclear whether this assertion was truly offered as "supporting facts" for Petitioner's insufficiency of the evidence claim or whether it actually was intended to be a separate claim for relief.[15] But, even if Petitioner intended to present a separate claim – i.e., that he was denied a fair trial because of the amount of "gang evidence" – that claim cannot be adjudicated here because Petitioner has not tied that claim to the federal constitution. See Wainwright v. Goode, 464 U.S. 78, 83 (1983) (per curiam) ("[i]t is axiomatic that federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension").

Even if Petitioner intended to claim that the "gang evidence" presented at his trial deprived him of his federal constitutional right to due process, that claim could not be entertained here because Petitioner did not present any such constitutional claim in his direct appeal to the Minnesota Supreme Court. Petitioner's brief on direct appeal includes the following brief assertion:

---

[15] It is not readily apparent how Petitioner's assertion that there was too much gang evidence could support his claim that there was insufficient evidence to prove he was guilty of committing a crime for the benefit of a gang.

> [T]he gang testimony was so omnipresent during trial, it would have had to have had a strong effect in the jury's deliberations on both counts.... Because this gang evidence was so pervasive a part of the trial, the introduction of gang evidence where no gang was proved should cause this Court to reverse and remand both counts.

(Respondent's Appendix, p. 54.) The presentation of Petitioner's "too much gang evidence" claim to the Minnesota Supreme Court does not mention the federal Constitution, or any federal case law, nor does it mention "due process," "fair trial," "prejudice" or anything else suggesting that Petitioner was attempting to raise a federal constitutional claim in this part of his direct appeal.

As previously discussed, the United States Supreme Court has plainly stated that "[i]f state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." Duncan, 513 U.S. at 365-66. When Petitioner presented his "too much gang evidence" claim to the Minnesota Supreme Court, he did not fairly inform that Court that he was presenting a federal constitutional claim. See id. 513 U.S. at 366 ("[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court"). Therefore, no such constitutional claim can be considered here. Id. It is now far too late to present any such constitutional claim to the Minnesota Supreme Court. (See Discussion at pp. 12-13, supra.) If Petitioner actually intended to argue that his federal constitutional rights were violated because too much gang evidence was presented at his trial, that claim has been

procedurally defaulted.[16]

The Court also notes that Petitioner's reply brief in this case appears to include a brand new (and belated) argument that he never should have been <u>charged</u> with committing a crime for the benefit of a gang. (Reply Memorandum, pp. 14-16.) Petitioner claims that his "due process rights were violated when he was charged with and tried for committing a crime for the benefit of a gang," (<u>id</u>., p. 14), because, even though he was not ultimately convicted of that crime, "the inclusion of this charge was prejudicial and the charge itself served as nothing more than an opportunity for the state to make an end run on the rules of evidence and attempt to convict Petitioner for this [gang] associations, alleged past bad acts, and the alleged bad acts of others," (<u>id</u>., p. 16).

This "wrongful charge" argument does not appear in Petitioner's habeas corpus petition or in his initial memorandum in support of his petition. More importantly, Petitioner has never presented this argument to the Minnesota Supreme Court, and it is now too late to do so. Therefore, this new argument must also be summarily denied based on procedural default.

## I. Ineffective Assistance of Counsel (Ground Ten)

Petitioner also challenges his conviction based on a claim of ineffective assistance of counsel– Ground Ten. Petitioner contends that the jury was not allowed to see a police officer's videotape of the crime scene, (discussed at pp. 27-29, <u>supra</u>), because of critical errors committed by his attorney. According to Petitioner, his attorney should have sought to introduce the videotape while the police officer was testifying for the prosecution, or else

---

[16] Petitioner has made no effort to show cause and prejudice, or proof of actual innocence, to excuse this procedural default. (<u>See</u> n. 6, <u>supra</u>.)

he should have subpoenaed the police officer to ensure his presence at trial. The attorney did not take either of those actions, and the police officer was unavailable when the attorney wanted to present the videotape to the jury. As a result, the videotape was not admitted into evidence. Petitioner contends that this affected the outcome of the trial, and he is now entitled to a writ of habeas corpus because he was deprived of his constitutional right to effective assistance of counsel. (See Petition, p. 20, "Ground Ten;" Petitioner's Memorandum, pp. 24-26; Petitioner's Reply, pp. 23-24.)

Petitioner's current ineffective-assistance-of-counsel claim cannot be decided on the merits because it has not been fairly presented to the Minnesota state courts. It is now too late to do so. In other words, Petitioner's ineffective assistance claim, as several of his other claims, has been procedurally defaulted.

Petitioner did present an ineffective-assistance-of-counsel claim in his pro se supplemental brief to the Minnesota Supreme Court. But, the claim that he presented to the State Court is completely different from the claim presented here. In Petitioner's State Court brief, he alleged that his attorney should have "investigated 'key' witness Jermaine Mack-Lynch" because "he would have discovered that Mr. Mack-Lynch committed perjury, when he testified to the Grand Jury." (Respondent's Appendix, p. 71.) Petitioner further alleged that, if his attorney had done a better job of investigating the case, Mack-Lynch's alleged "lies" would have "showed not only during trial, but in his statement to the police, as well as the pre-trial line-up." (Id.) Petitioner also faulted his trial counsel for "not raising substantive issues during trial." (Id. at 72.)

Petitioner's brief to the Minnesota Supreme Court, however, is insufficient to preserve his current claim that his attorney erred by failing to take proper steps to ensure

that the videotape of the crime scene would be introduced as evidence. Thus, the ineffective-assistance-of-counsel claim that is raised in Petitioner's current habeas corpus petition has never been fairly presented to the Minnesota Supreme Court. Because it is now too late to raise his current claim in the state courts, that claim has been procedurally defaulted.

Petitioner might believe that the ineffective assistance claim that he presented to the Minnesota Supreme Court was somehow "broad enough" to cover his current claim, but that notion must be rejected. The Eighth Circuit Court of Appeals has repeatedly held that state prisoners cannot raise one ineffective assistance claim in the state courts, and a different ineffective assistance claim in a federal habeas petition.

> A petitioner must present 'both the factual and legal premises' of his claims to the state courts in order to preserve them for federal habeas review . . . . This standard applies to claims that trial counsel has been constitutionally ineffective . . . . A habeas petitioner who asserts only broadly in his state petition for relief that his counsel has been ineffective has not immunized his federal habeas claim's specific variations from the effects of the state's procedural requirements . . . . Nor has a petitioner who presents to the state courts a broad claim of ineffectiveness as well as some specific ineffectiveness claims properly presented all conceivable specific variations for purposes of federal habeas review.

Flieger v. Delo, 16 F.3d 878, 884-85 (8th Cir.), cert. denied, 513 U.S. 946 (1994) (citations omitted). The Court of Appeals' decision in Flieger was fully consistent with two previous decisions: Tippitt v. Lockhart, 903 F.2d 552, 554 (8th Cir. 1990), cert. denied, 498 U.S. 922 (1990), and Buckley v. Lockhart, 892 F.2d 715, 719 (8th Cir.1989), cert. denied, 497 U.S. 1006 (1990). In Tippitt, the Court said –

> We conclude Tippitt's habeas claims for ineffective assistance were not presented in his state petitions. While his state petitions do generally allege ineffective assistance, they simply do not present the same specific claims of ineffective assistance made out in the habeas petition. The legal theory

of ineffective assistance is broadly the same, but the factual allegations are not. On this record, we cannot say the same facts and legal theories are present in both the state and federal claims for relief.

903 F.2d at 554.

In more recent cases, the Court of Appeals has reiterated that an ineffective-assistance-of-counsel claim is not reviewable in a federal habeas proceeding unless <u>the same</u> ineffective assistance claim was raised in the state courts. <u>See</u> <u>Wyldes v. Hundley</u>, 69 F.3d 247, 253 (8th Cir. 1995) ("we require habeas petitioners to present to the state courts 'the same specific claims of ineffective assistance made out in the habeas petition'" (quoting <u>Tippitt</u>, <u>supra</u>)), <u>cert</u>. <u>denied</u>, 517 U.S. 1172 (1996); <u>Osborne v. Purkett</u>, 411 F.3d 911, 919, n.7 (8th Cir. 2005) (state court claim that attorney did not properly cross-examine a witness "was insufficient to preserve the related, but different, ineffective-assistance claim based on counsel's failure to investigate"), <u>cert</u>. <u>denied</u>, 547 U.S. 1022 (2006).

Here, the claim of ineffective assistance of counsel that is raised in Petitioner's current habeas corpus petition was not raised in his state court appeal. Furthermore, Petitioner's current ineffective assistance claim is no longer reviewable in the Minnesota state courts. (<u>See</u> <u>McCall</u>, <u>supra</u>, and Discussion at pp. 12-13, <u>supra</u>.) Therefore, that claim has been procedurally defaulted for federal habeas corpus purposes. Petitioner has not shown cause and prejudice or proof of actual innocence to excuse the procedural default of his current ineffective-assistance-of-counsel claim. Therefore, Petitioner's ineffective-assistance-of-counsel claim (Ground Ten) must be summarily denied.

Finally, Petitioner could not prevail on his current ineffective-assistance-of-counsel claim because prejudice is an essential element of such a claim. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 692 (1984) ("any deficiencies in counsel's performance must

be prejudicial to the defense in order to constitute ineffective assistance under the Constitution"). The Court has already determined that Petitioner has failed to show that he was prejudiced by the inadmissibility of the police officer's videotape. (See Discussion at pp. 28-29, supra.) Therefore, even if Petitioner's attorney did commit an error that led to the exclusion of the videotape, that error would not entitle Petitioner to a writ of habeas corpus based on ineffective assistance of counsel.

### J. Unconstitutional Sentence Claim (Ground Two)

"Ground Two" of the petition is an Eighth Amendment challenge to Petitioner's sentence. Petitioner contends he should be granted a writ of habeas corpus that would vacate his sentence because it is cruel and unusual punishment to send a minor mandatorily to prison for life without the possibility of parole.

Petitioner's Eighth Amendment claim is grounded on three recent U.S. Supreme Court decisions: (1) Roper v. Simmons, 543 U.S. 551 (2005); (2) Graham v. Florida, 130 S. Ct. 2011 (2010); and (3) Miller v. Alabama, 132 S. Ct. 2455 (2012). In Roper, the Court held that the Eighth Amendment prohibits capital punishment for a criminal who committed his offense before reaching the age of eighteen. In Graham, the Court held that the Eighth Amendment prohibits a sentence of life in prison without parole for a criminal who committed a non-homicide offense before reaching the age of eighteen. And in Miller, the Court held that the Eighth Amendment prohibits a mandatory sentence of life in prison without parole for a criminal who commits any crime (even homicide) before reaching the age of eighteen. Miller bars mandatory life without parole for minors. Life without parole for minors is still permissible–if the sentencing court has considered the individual

circumstances of the minor and his crime.[17]

At the time of Petitioner's sentencing, and when his case was before the Minnesota Supreme Court on direct appeal, only Roper had been decided. Petitioner challenged the constitutionality of his sentence in his direct appeal, citing Roper, but that challenge was rejected. The Minnesota Supreme Court concluded that Roper's prohibition against capital punishment for minors did not prohibit life without parole for minors. Martin, 773 N.W.2d at 97-98.

Petitioner's direct appeal was decided by the Minnesota Supreme Court on October 8, 2009. Petitioner did not seek certiorari review in the United States Supreme Court, so his conviction and sentence became final on direct appeal upon the expiration of the 90-day deadline for seeking certiorari review – i.e., on or about January 6, 2010.[18] Graham was not decided until May 17, 2010 – more than five months after Petitioner's conviction and sentence became final on direct appeal. Miller was not decided until June 25, 2012, which was more than two years after Petitioner's conviction and sentence became final on direct appeal.[19] Thus, the Minnesota Supreme Court obviously did not have the benefit of either

---

[17] Some of the individual circumstances specifically mentioned by the Supreme Court are the defendant's "chronological age" and "family and home environment," "the circumstances of the homicide offense, including the extent of his participation," "the way familial and peer pressures may have affected him," "his incapacity to assist his own attorneys," and the "possibility of rehabilitation." Miller, 132 S. Ct. at 2468.

[18] See Greene v. Fisher, 132 S. Ct. 38, 44 (2011) ("[f]inality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from this Court has become time barred or has been disposed of").

[19] In fact, Miller was not decided until after both parties had submitted all of their initial briefing in the present habeas case. It appeared to the Court that Miller could have some bearing on the outcome of Petitioner's Eighth Amendment claim, so the parties were required to submit further briefing on the relevance of Miller. (See Order dated October 4,

<u>Graham</u> or <u>Miller</u> when Petitioner's direct appeal was decided.

For present purposes, <u>Miller</u> is the critical case. Respondent acknowledges that Petitioner was a minor at the time of his offense and he was given a mandatory sentence of life without parole without any consideration for the sentencing factors prescribed by <u>Miller</u>. As explained by Respondent: "The statutory framework under which the district court sentenced Martin violates <u>Miller</u> because life without parole is the mandatory minimum sentence for juveniles sixteen years or older who are convicted of first-degree premeditated murder." (Respondent's Supplemental Brief, [Docket No. 26], p. 4.)[20] Thus, if <u>Miller</u> controls, Petitioner's sentence must be vacated.

Both Petitioner and Respondent contend that <u>Miller</u>'s applicability is governed by the retroactivity principles prescribed by <u>Teague v. Lane</u>, 489 U.S. 288 (1989). In <u>Teague</u> and subsequent cases, the Supreme Court has "laid out the framework to be used in determining whether a rule announced in one of [its] opinions should be applied retroactively to judgments in criminal cases that are already final on direct review." <u>Whorton v. Bockting</u>, 549 U.S. 406, 416 (2007). "Under the <u>Teague</u> framework, an old rule

---

2012, [Docket No. 25].) Both parties have submitted supplemental briefs addressing <u>Miller</u>, (Docket Nos. 26 and 28), and the Court has considered the arguments presented in those new briefs.

[20] Respondent has further explained that:

"In Minnesota, life without parole is the mandatory minimum sentence for any conviction of first-degree premeditated murder in district court. <u>See</u> Minn. Stat. § 609.185(a)(1); § 609.106, subd. 2(1). Under this statutory framework, Martin, who was seventeen when he committed his crime, was subject to a mandatory minimum sentence of life without parole; under no circumstances could he have been sentenced to anything less."

(Respondent's Supplemental Brief, [Docket No. 26], p. 3.)

applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." Id. (citing Griffith v. Kentucky, 479 U.S. 314 (1987)). "A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a 'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding.'" Whorton, 549 U.S. at 416 (quoting Saffle v. Parks, 494 U.S. 484, 495 (1990); Teague, 489 U.S. at 311).

Thus, according to Whorton, the first step when performing a Teague retroactivity analysis is to determine whether the decision at issue, (in this case, Miller), announces a "new rule" or merely applies an "old rule." If the decision is merely an expectable extension of an "old rule," it can properly be applied on both direct review and collateral review, but if a "new rule" has been announced, the decision does not apply on collateral review, unless one of the two "Teague exceptions" is applicable. To be applicable on collateral review, the new rule must be either (i) a "substantive" rule, or (ii) a "watershed rule of criminal procedure." Whorton, supra.

### 1. Miller Is A "New Rule"

The Supreme Court has provided the following guidance for determining whether a decision should be treated as a "new rule" for Teague purposes:

> A holding constitutes a 'new rule' within the meaning of Teague if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not 'dictated by precedent existing at the time the defendant's conviction became final.' Teague, supra, 489 U.S., at 301 . . . . we have held that '[t]he 'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts.' Butler v. McKellar, [494 U.S. 407, 414 (1990)] . . . . This principle adheres even if those good-faith interpretations 'are shown to be contrary to later decisions.' Ibid. Thus, unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so now.' Saffle v.

Parks, supra, 494 U.S., at 488 . . . ."

Graham v. Collins, 506 U.S. 461, 467-68 (1993).

Applying this guidance here, the Court finds that Miller does announce a "new rule" for Teague purposes. Even after Roper and Graham, reasonable jurists could have concluded that mandatory life in prison without parole for minors convicted of first-degree premeditated murder would not violate the Eighth Amendment. Indeed, in Miller itself, four members of the Supreme Court concluded that the majority's "holding does not follow from Roper and Graham." Miller, 132 S. Ct. at 2480 (Roberts, C.J., dissenting).[21] Even the majority opinion in Miller did not assert that the outcome of that case was "dictated" or "compelled" by the Court's prior decisions. The majority found that the Court's precedents, including Roper and Graham, merely "teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." Id. at 2468 (emphasis added).

In a pre-Miller case, the Eleventh Circuit Court of Appeals determined that "even considering Graham along with Roper, 'fairminded jurists' could conclude that it is constitutionally permissible to impose a life without parole sentence on a juvenile convicted of homicide." Loggins v. Thomas, 654 F.3d 1204, 1221 (11th Cir. 2011).[22] The Eleventh

---

[21] The four dissenters in Miller further stated: "That Graham does not imply today's result could not be clearer," and "Roper provides even less support for the Court's holding" than Graham. 132 S. Ct. at 2480, 2481 (Roberts, C.J., dissenting). Thus, four "reasonable jurists" sitting on the U.S. Supreme Court obviously do not believe that the rule announced in Miller was "dictated" by the Court's prior rulings in Roper and Graham.

[22] As in Miller, the defendant in Loggins was given an automatic (non-discretionary) sentence of life in prison without parole. Loggins, 654 F.3d at 1228 ("[a]s required by Alabama law, at his resentencing Loggins was mandatorily sentenced to life without parole").

Circuit further noted that "[i]n every decision on point that we could find, courts faced with the issue have held that a life without parole sentence may constitutionally be imposed on a juvenile who commits murder." Id. at 1222, n. 5 (citing eight post-Roper state court decisions, including the Minnesota Supreme Court's decision in Martin). Ultimately, the Eleventh Circuit flatly declared in Loggins that "the Supreme Court did not imply in Roper or in Graham that a life without parole sentence is impermissible for a juvenile who commits a homicide. If anything, Roper implies that it is permissible." Id. at 1222. Loggins demonstrates that Miller was not an inevitable extension of Roper and Graham.

Petitioner has not cited, and the Court is not otherwise aware of, any cases before Miller which held that mandatory life without parole for minors is unconstitutional. Moreover, Petitioner has not even argued, much less demonstrated, that Miller was an inevitable extension of prior Supreme Court decisions. Thus, the Court concludes that Miller is indeed a "new rule" for Teague purposes.

### 2. Application of § 2254(d)(1)

If this case were not a § 2254 habeas corpus proceeding, the Court would next consider whether the new rule announced in Miller falls within one of Teague's two exceptions, which would allow Miller to be applied retroactively on collateral review. The Court must, however, not lose sight of the fact that this is a § 2254 proceeding, which means that regardless of how the Teague retroactivity issue might be resolved, Petitioner cannot be granted relief in this case unless he shows that the Minnesota Supreme Court's ruling on his Eighth Amendment claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

44

In <u>Greene v. Fisher</u>, 132 S. Ct. 38, 44 (2011), the Court said:

> AEDPA did not codify <u>Teague</u>, and . . . 'the AEDPA and <u>Teague</u> inquiries are distinct.' <u>Horn v. Banks</u>, 536 U.S. 266, 272 . . . (2002) (<u>per</u> <u>curiam</u>). The retroactivity rules that govern federal habeas review on the merits – which include <u>Teague</u> – are quite separate from the relitigation bar imposed by AEDPA; neither abrogates or qualifies the other . . . . [W]e see no reason why <u>Teague</u> should alter AEDPA's plain meaning."[23]

<u>Greene</u> indicates that, when a state prisoner is seeking collateral relief under § 2254 based on a "new rule" of constitutional law, he must satisfy two separate eligibility requirements – (1) the "retroactivity rules" of <u>Teague</u> and its progeny, and (2) the statutory criteria set forth in § 2254(d). The Court begins its analysis by first considering the implications of § 2254(d) before considering whether either of the two <u>Teague</u> exceptions allows Petitioner to invoke <u>Miller</u>'s new rule to support his Eighth Amendment claim. In doing so, the Court will first consider whether the Minnesota Supreme Court's ruling on Petitioner's Eighth Amendment claim involves an objectively unreasonable application of clearly established Supreme Court precedents.

### 3. Clearly Established Supreme Court Precedents

The Supreme Court has ruled that "§ 2254(d)(1) requires federal courts to focus on what a state court knew and did, and to measure state-court decisions against this Court's precedents <u>as of the time the state court renders its decision</u>." <u>Green</u>, 132 S. Ct. at 44 (emphasis added) (quotations omitted); <u>see also</u> <u>Guinn v. Kemna</u>, 489 F.3d 351, 353 (8th Cir. 2007) ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal

---

[23] This statement in <u>Greene</u> is followed by a footnote that says: "Whether § 2254(d)(1) would bar a federal habeas petitioner from relying on a decision that came after the last state-court adjudication on the merits, but fell within one of the exceptions recognized in <u>Teague</u>, 489 U.S., at 311 . . . is a question we need not address to resolve this case." 132 S.Ct. at 44, n. *.

principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" (quoting <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72 (2003)), <u>cert</u>. <u>denied</u>, 552 U.S. 1286 (2008). Therefore, this Court must determine whether the Minnesota Supreme Court's resolution of Petitioner's Eighth Amendment claim was contrary to, or involved an unreasonable application of, apposite U.S. Supreme Court precedents <u>that existed when the Minnesota Supreme Court adjudicated Petitioner's claim</u>. <u>See</u> <u>Losh v. Fabian</u>, 592 F.3d 820, 823 (8th Cir. 2010) ("[o]nly rulings in Supreme Court decisions issued before the state court acts are considered clearly established federal law").

As noted above, Petitioner's direct appeal was decided by the Minnesota Supreme Court on October 8, 2009, which was after <u>Roper</u>, but before <u>Graham</u> and <u>Miller</u>. Therefore, the issue to be decided here is whether the Minnesota Supreme Court's adjudication of Petitioner's Eighth Amendment claim was contrary to, or involved an unreasonable application of, <u>Roper</u>. For purposes of determining Petitioner's eligibility for a writ of habeas corpus under § 2254(d)(1), this Court <u>cannot</u> consider the reasonableness of the State Court's decision in light of any United States Supreme Court rulings handed down after October 8, 2009 – including <u>Graham</u> and, more significantly, <u>Miller</u>.

### 4. Minnesota Supreme Court's Ruling Is Not Objectively Unreasonable

In order to satisfy the standard established by § 2254(d)(1), Petitioner would have to show that the Minnesota Supreme Court's ruling on his Eighth Amendment claim was objectively unreasonable because the State Court failed to anticipate correctly the U.S. Supreme Court's decision (more than two years later) in <u>Miller</u>. This Court, however, has already determined that before <u>Miller</u>, reasonable jurists could have concluded that <u>Roper</u> did <u>not</u> necessarily preordain that mandatory life without parole for minors would violate the

46

Eighth Amendment. It has already been determined that, for <u>Teague</u> purposes, <u>Miller</u> represents a "new rule," meaning that it was not readily foreseeable before it was handed down. Because <u>Miller</u> announced a new rule of constitutional law, the Minnesota Supreme Court's adjudication of Petitioner's Eighth Amendment claim was <u>not</u> "objectively unreasonable," even though it would now be apparent that <u>Miller</u> has invalidated that ruling. Because the Minnesota Supreme Court reasonably applied the controlling U.S. Supreme Court precedents as of the date when <u>Martin</u> was decided, Petitioner cannot be granted a writ of habeas corpus pursuant to § 2254(d)(1).

The Court is mindful of the Supreme Court's decision in <u>Horn v. Banks</u>, which reiterated that if a federal habeas petitioner "'seeks the benefit of a new rule of constitutional law, the court <u>must</u> apply <u>Teague</u> before considering the merits of the claim.'" 536 U.S. at 271, quoting <u>Caspari v. Bohlen</u>, 510 U.S. 383, 389 (1994) (emphasis in the original). However, <u>Horn</u> also clearly reiterates that "the AEDPA and <u>Teague</u> inquires are distinct," (536 U.S. at 272), and thus a federal habeas petitioner cannot be granted relief based on a new constitutional rule unless his claim is sustainable under <u>both</u> <u>Teague</u> <u>and</u> § 2254(d). Satisfying <u>Teague</u> alone is not enough. A <u>Teague</u> analysis must be done "in addition to performing any analysis required by AEDPA." <u>Horn</u>, 536 U.S. at 272.

In <u>Horn</u>, the Supreme Court held that in cases involving a retroactivity issue, a federal court cannot <u>grant</u> a writ of habeas corpus to a state prisoner without considering both <u>Teague</u> and AEDPA. <u>See</u> <u>id</u>. at 271 ("it was incumbent upon the Court of Appeals to perform a <u>Teague</u> analysis before <u>granting</u> respondent relief") (emphasis added). Because habeas relief cannot be <u>granted</u> unless the petitioner satisfies the requirements of <u>both</u> <u>Teague</u> and AEDPA, it follows that habeas relief must be <u>denied</u> if the petitioner fails to

satisfy either of those requirements.  As the First Circuit Court of Appeals explained in

Goodrich v. Hall, 448 F.3d 45, 49 (1st Cir. 2006):

> It is clear that a Teague analysis would be required before a federal court
> may grant a habeas petition.... [Citations to Horn and Caspari omitted.]  The
> reverse is not true. This court has held that where a habeas petition can
> easily be denied on other grounds, there is no need to do a Teague analysis
> first.

(Emphasis added.)[24]

In this case, Petitioner's Eighth Amendment claim must be denied because he

cannot satisfy the requirements of AEDPA.  Regardless of whether Miller is retroactively

applicable on collateral review pursuant to Teague, Petitioner cannot show that the

Minnesota Supreme Court's resolution of his Eighth Amendment claim was objectively

unreasonable under then-existing U.S. Supreme Court decisions.  Petitioner has raised a

Teague issue, the Court has conducted a "threshold Teague analysis" in accordance with

Horn v. Banks, (536 U.S. at 272), and the Court has determined that Miller does announce

a new rule for Teague purposes.  However, for AEDPA purposes, the Minnesota Supreme

Court's resolution of Petitioner's Eighth Amendment claim must be viewed in light of pre-

Miller precedents.   Before Miller, the decisions of the United States Supreme Court,

including Roper, did not compel reasonable jurists to conclude that mandatory life without

parole must be unconstitutional.  (That is precisely the reason Miller is a "new rule" for

Teague purposes.)  Therefore, the Minnesota Supreme Court's resolution of Petitioner's

---

[24] See also Abraham v. United States, No. 11-3284 (8th Cir. Nov. 15, 2012), 2012
WL 5519093 at *3 (no need to decide whether Padilla v. Kentucky, 130 S. Ct. 1473 (2010),
is retroactively applicable on collateral review pursuant to Teague as defendant's § 2255
ineffective assistance of counsel claim was unsustainable in any event, for lack of
prejudice).

Eighth Amendment claim on direct appeal did <u>not</u> involve an objectively unreasonable application of existing U.S. Supreme Court precedents – which means Petitioner cannot be granted a writ of habeas corpus on that claim under § 2254(d).

Although the Court has concluded that Petitioner cannot be granted a writ of habeas corpus on his Eighth Amendment claim, because he cannot satisfy § 2254(d), it remains uncertain whether <u>Miller</u>'s new rule actually is, or is not, retroactively applicable on collateral review under either of the two <u>Teague</u> exceptions. It is conceivable that a <u>state</u> post-conviction court, unfettered by the narrow scope of review mandated by § 2254(d), could conclude that <u>Miller</u> is either a new "substantive" rule, or a "watershed rule of criminal procedure," and is therefore retroactively applicable on collateral review. In that event, the <u>state</u> court might conclude that Petitioner is entitled to re-sentencing in accordance with <u>Miller</u>. Again, this Court concludes only that Petitioner cannot be granted a writ of habeas corpus under § 2254(d) because the Minnesota Supreme Court's adjudication of his Eighth Amendment claim did not involve an objectively unreasonable application of then-existing Supreme Court precedents.[25]

_____

[25] The Court's analysis of Petitioner's Eighth Amendment claim might seem to imply that § 2254(d) has made <u>Teague</u> obsolete, but that certainly is not the case. As the Supreme Court made clear in <u>Horn</u>, a habeas petitioner cannot be <u>granted</u> a writ of habeas corpus based on a new rule of constitutional law unless he qualifies for relief under <u>Teague</u> as well as § 2254(d). In post-conviction proceedings brought by federal prisoners under 28 U.S.C. § 2255, the requirements of § 2254(d) are inapplicable, and retroactivity issues must be resolved solely under <u>Teague</u>. <u>See</u> <u>In re Sparks</u>, 657 F.3d 258, 262 (5th Cir. 2011) (holding that <u>Graham v. Florida</u> is retroactively applicable on collateral review under § 2255 pursuant to <u>Teague</u>). Furthermore, § 2254(d) obviously plays no role in <u>state</u> court post-conviction proceedings, but Minnesota state courts apply <u>Teague</u> to determine whether a new rule should be applied retroactively on collateral review. <u>See</u> <u>Campos v. State</u>, 816 N.W.2d 480, 488 (Minn. 2012) ("[w]e follow the retroactivity principles outlined in <u>Teague</u> . . . when considering whether a rule of federal constitutional law applies to a criminal conviction that was final when the rule was announced"), <u>pet. for cert. filed</u>, Sept. 17, 2012,

## IV. CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. Daniel, 529 U.S. 473, 484 (2000).

In this case, the Court finds that it is unlikely that another court would decide any of Petitioner's claims any differently than they have been decided here – with one possible exception.  The Court finds that Petitioner's Eighth Amendment challenge to his sentence presents an issue that could be debated by reasonable jurists and warrants appellate review.

Aside from this single sentencing issue, the Court finds nothing novel, noteworthy or worrisome about this case that warrants appellate review.  It is therefore recommended that Petitioner should **not** be granted a COA in this matter – except for the Eighth Amendment issue implicated above.

---

(No. 12-7117).  Thus, Teague remains a critical doctrine whenever a prisoner seeks collateral relief based on a new Supreme Court decision.  However, Teague does not trump the restrictions on issuing writs of habeas corpus that Congress has imposed in § 2254(d).

## V.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be **DENIED**;

2.  This action be **DISMISSED WITH PREJUDICE**; and

3.  Petitioner should be granted a Certificate of Appealability solely on the Eighth Amendment challenge to his sentence ("Ground Two").

Dated: January_____7_____, 2013

                                     ___*s/ Tony N. Leung*_____
                                     TONY N. LEUNG
                                     United States Magistrate Judge

                                     *Martin v. Symmes*
                                     File No. 10-cv-4753 (SRN/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **January 22, 2013**.